UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROY AUSTIN SMITH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CAUSE NO. 3:07-CV-0207 PS |
| DAWN BUSS, *et al.*, | ) ) ) |
| Defendants. | ) |

**REPORT AND RECOMMENDATION**

This case was filed *pro se* by Roy Austin Smith. The complaint was screened pursuant to 28 U.S.C. § 1915A, and Smith was granted leave to proceed on a claim that Indiana State Prison ("ISP") officials were deliberately indifferent to his safety, in violation of the Eighth Amendment, when they failed to protect him from being attacked and injured by another inmate, Trinity Hunter, on November 25, 2005.[1] [Doc. No. 5].

In their answer, the defendants asserted the affirmative defense that Smith had not exhausted his administrative remedies, and on June 25, 2008, they moved for summary judgment on that basis. This Court granted summary judgment, Smith appealed, and on February 22, 2010, the United States Court of Appeals for the Seventh Circuit concluded that a genuine issue of fact existed as to the exhaustion of administrative remedies, and remanded the case "to hold an evidentiary hearing, as outlined in *Pavey,* 544 F.3d at 742, to

---

[1] Trinity Hunter filed his own complaint, 3:07cv593 RL, alleging that on November 25, 2005, he "was stabbed repeatedly by another offender who . . . [ISP officials] . . . allowed to break the safety and security of the facility and enter my cell through an unlocked door." [Doc. No. 1 at 3]. That complaint was dismissed for failure to exhaust administrative remedies, and is currently on appeal.

resolve the issue of exhaustion." [Doc. No. 61-1 at 4]. The presiding judge referred this matter to the undersigned magistrate judge to hold an evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008) to determine the factual issue of whether or not Smith's failure to exhaust his administrative remedies was "innocent."

At the hearing, Smith testified that after his altercation with Hunter he was taken to the Special Management Unit (SMU) where he remained for four days. According to Smith, he sought, but was unable to obtain, grievance forms and a pencil while he was on the SMU. [Doc. No. 84 at 11-12]. On November 29, 2005, he was transferred to the pre-hearing segregation unit, NSB (New Service Building), where he unsuccessfully asked a guard for a grievance form. [Doc. No. 84 at 13]. Two weeks later, Smith was transferred to IDU (Intensive Detention Unit), a disciplinary segregation unit, where he says he was told he could only get a grievance form from Lieutenant Kruper. He states that he asked Lieutenant Kruper for a grievance form but never got one from the lieutenant. [Doc. No. 84 at 14].

Smith testified that he eventually got a grievance form in "mid-December," and began filing grievances, [Doc. No. 84 at 15-16], but that his submissions were returned for various deficiencies or requests for further information. [Doc. No. 84 at 16-18]. He testified that he eventually filed grievances, which were assigned two cause numbers, 13359 and 13361, and then denied them as untimely. [Doc. No. 84 at 18]. Smith saw this as "the end of the grievance process . . . so I filed my lawsuit." [Doc. No. 84 at 18].

Howard Morton testified that he has been the ISP Executive Assistant since December 2005, and in that capacity he oversees the grievance procedure at the prison. He stated that a new grievance procedure went into effect on December 1, 2005, and that there was a transition period during which grievances filed under the old system were still accepted. [Doc. No. 84 at 40-43]. He testified that all grievances received by the grievance office, whether they are adequate or not are "filed" by being "entered" into the computer. [Doc. No. 84 at 44-45]. Inadequate grievances are returned to the grievant, who has five days to correct any deficiencies." [Doc. No. 84 at 45-47].

Lori Smales testified that she has been the secretary to the ISP Executive Assistant since December 2005, and that she processes all incoming grievances. [Doc. No. 84 at 55]. She testified that when she received grievances "we would log them into the computer system and determine whether or not they were acceptable and either - - if they were acceptable, they would get a receipt. And if they weren't, they would be sent back. Then they went to our grievance officer, who would do the investigating." [Doc. No. 84 at 56, 62-63].

According to Ms. Smales, Smith's offender grievance history report [Exhibit 4] shows that the first record of any grievance regarding the incident with Hunter having been received by her office was in April 2006, [Doc. No. 84 at 58], and that if she had received earlier grievances there would be a record of it in the computer system. [Doc. No. 84 at 62-3]. She testified that she handled

Smith's grievances, dated April 3, 2006, and that she "received it[2] and logged it on the 7th of April." [Doc. No. 84 at 59]. After logging Smith's grievances, she "returned [them] to him because he did not try to attempt the informal resolution and also because he had asked for monetary compensation." [Doc. No. 84 at 60]. Importantly, She did not return the grievances to Smith because they were untimely. [Doc. No. 84 at 64]. Ms. Smales testified that when she returned the grievance Smith had five days within which to resubmit his grievances but that she did not receive a response from him. [Doc. No. 84 at 60-61].

Vernon Tiedeman testified that in November and December of 2005 he was a correctional officer working on the NSB unit. [Doc. No. 84 at 68]. He stated that he did not recall specifically whether Smith asked him for a grievance form during those months [Doc. No. 84 at 68-70], "but if he had asked for one, I don't have any specific reason why he wouldn't have been able to get one. I could have been busy, I could have been doing other things, maybe forgotten to give him one at one time . . . He could have asked anyone of the other officers or staff that was there to go ahead and get this form for

---

[2] Smith prepared two related grievances dealing with the incident of November 25, 2005, both dated April 3, 2006. The first grievance, which was assigned the number 10950 [exhibit 5] asserted that the IDOC failed to protect Smith from being beaten by Hunter, the second, which was assigned the number 10955 [exhibit 6], asserted that the acting ISP Superintendent falsely labeled him as a snitch, placing him in danger and precipitating the attack by Hunter. Defendants' counsel handed both exhibits to Ms. Smales [Doc. No. 84 at 59], and asked her questions about how she handled exhibit 5 [Doc. No. 84 at 59-62, 64-5]. Defendants' counsel did not ask her how she handled exhibit 6, other than asking whether she would "have logged every grievance that you received into the office . . . in a similar way that you did with exhibits 5 and 6." [Doc. No. 84 at 62]. The materials in the two exhibits establish that both grievances were returned for the same reasons, and the court construes Ms. Smales's testimony about how she handled exhibit 5 as applying equally to exhibit 6.

him." [Doc. No. 84 at 69].

Erik Kruper testified that between November 2005 and April 2006 he was a correctional lieutenant assigned as zone supervisor of the detention units, including the SMU, IDU and NSB. [Doc. No. 84 at 72]. He testified that an inmate in SMU could have been given a "security pen" unless he was a "violent, self-inflictive person." [Doc. No. 84 at 78, 80] and that was possible for an inmate in SMU to have a staff member help him file a grievance. [Doc. No. 84 at 81]. Lieutenant Kruper testified that he does not recall Smith ever asking him for a grievance form and "absolutely" did not recall ever refusing Smith a grievance form. [Doc. No. 84 at 76]. He stated that there was no reason not give grievance forms to prisoners and that his normal practice was "if they asked me for one, I'd give 'em two." [Doc. No. 84 at 76].

I. FINDINGS OF FACT

It is undisputed that the ISP had a grievance system in effect when the incident Smith complains of occurred, that defendants afforded inmates twenty working days from the date of an incident to file a grievance dealing with that incident, that two grievances prepared by Smith, dated April 3, 2006, were received by the executive assistant's office on April 7, 2006, and were returned to Smith affording him five days within which to cure deficiencies, and that two other grievances prepared by Smith were received by the executive assistant's office on May 25, 2006, and were denied as untimely. Smith asserts that he attempted to correct the deficiencies noted by the return of grievance forms for the grievances he filed on April 3, 2006, the defendants assert that there is no proof that he did attempt to correct the deficiencies noted in the return of

5

grievance forms dated April 7, 2006. The disputed issues of facts deal with whether actions by prison officials prevented Smith from completing the grievance process or whether his failure to exhaust was innocent.

Immediately after the incident between Smith and Hunter, Smith was taken to the SMU, where he remained until November 29, 2005. Smith testified that he was not allowed access to a pen or a grievance form for the four days he was confined in the SMU, even though he asked for one. The defendants provided testimony that a prisoner on the SMU could have received grievance forms and that most SMU prisoners should have been able to have access to security pens, though none of their testimony directly rebuts Smith's claim that he asked for these materials while he was in the SMU and did not receive them. Smith disputes that he could have received a pen while he was in the SMU without the "specific approval of the shift supervisor." [Doc. No. 84 at 89]. The court concludes that even if Smith's version of events is correct, it is not dispositive on to the question of whether the actions of prison officials while he was at the SMU prevented him from filing a timely grievance dealing with the events of November 25, 2005, because when Smith left the SMU he still had at least eighteen working days within which to file a grievance.[3]

On November 29, 2005, Smith was transferred to the NSB segregation unit. He testified that while he was there, he spoke to Officer Tiedeman about filing a grievance. Officer Tiedeman testified that he did not recall Smith asking

---

[3] November 26 and 27, 2005, fell on a weekend, and did not count toward the limit of twenty working days established by the IDOC policy. Moreover, the defendants argue that they "wouldn't have counted those four days against him" for purposes of calculating timeliness," [Doc. No. 84 at 37-38], and if that were the case then his twenty days did not even begin to run until he left the SMU.

6

him for a grievance, which the court finds unsurprising given that these events occurred five years ago, but that if he was asked for a form and did not provide it his failure to do so was unintentional. [Doc. No. 84 at 69]. The court finds Officer Tiedeman to be credible, and credits his testimony that any failure on his part to provide Smith a grievance form was unintentional. The court also credits his testimony that there were other officers working on the unit who Smith could have asked for a grievance form. Moreover, whether or not Smith tried to get a grievance form while he was in this unit is not dispositive on the question of whether the actions of prison officials while he was at the NSB prevented him from filing a timely grievance dealing with the events of November 25, 2005, because when Smith left the NSB on December 13, 2005, he was still within the time when he could file a grievance dealing with that incident.

On December 13, 2006, Smith arrived at the IDU segregation unit. He testified at the hearing that he had obtained a grievance form by "mid-December," [Doc. No. 84 at 15], which he later clarified as "[p]robably within a matter of days of getting on IDU . . . [p]robably December the 15th, somewhere up there, December the 13th, maybe, is when I got to the Unit." [Doc. No. 84 at 92]. The court concludes that by December 15, 2005, at the latest, which is within the twenty working days established by the policy, Smith had all of the materials necessary to prepare a grievance dealing with the incident of November 25, 2005.

Lori Smales testified that all grievances received by her office were logged

7

into the computer, and that those that were defective for some reason were returned to the inmate who was given five days to correct any deficiencies and refile the grievance. The Court finds her a credible witness, and concludes that her testimony and the History of Grievances for Offender Roy Smith [exhibit 4] establish that the executive assistant's office received two grievances from Smith on April 7, 2006, dealing with the events of November 25, 2005, and that Ms. Smales filed these grievances by entering them into the computer.

Smith testified that he submitted several grievances early in the process, but that "they were returned for various reasons" such as "[n]eed a counselor's signature, got to get the grievance form from the lieutenant" [Doc. No. 84 at 16], and that he "continued this until I was allowed to file a grievance form." [Doc. No. 84 at 17]. The Court has already found Smales to be credible, and credits her testimony. Accordingly, that Smith's offender grievance history report shows that the first record of any grievance having been filed with the executive assistant's office was April 7, 2006, sufficiently establishes that the two grievances Smith prepared on April 3, 2006, were the first grievances concerning his encounter with Hunter that were actually received by the executive assistant's office. To the extent Smith's testimony suggests that he filed other grievances prior to April 7, 2006, that were returned to him is inconsistent with Ms. Smales' testimony that all grievances that are received by her and returned to inmates are logged in.

The grievances filed on April 7, 2006, were both returned to Smith because there was "[n]o indication that you have attempted to resolve this

grievance informally." [Exhibit 5 at 2 and 6 at 2]. The return of grievance forms advised Smith that if he had tried to resolve the grievances informally, he could resubmit them within five days adding that information, and that if he "did not attempt to resolve this grievance informally, you have five (5) working days from the date below to attempt to do so; otherwise this grievance will not be considered." The forms also noted that the "grievance process does not award monetary compensation."

The offender grievance program return of grievance form lists several reasons for returning a grievance form to the grievant. One of the reasons a grievance could be returned to an inmate is that "[t]his grievance/appeal was not submitted within the allowed time frame. Unless you can show just reason(s) for this delay, this grievance/appeal will not be reviewed." [Exhibits 5 at 2 and 6 at 2]. The return of grievance forms contained in exhibits 5 and 6 were not marked as being returned for being untimely; rather they were marked as being returned because there was no indication that Smith had attempted to informally resolve either grievance as required by IDOC policy.[4]

The grievances filed on April 7, 2006, were signed by Smith beyond the twenty working days established by IDOC policy. But IDOC policy establishes that grievance officials had the discretion to accept grievances that were submitted late. [Doc. No. 84 at 46]. The court concludes that the facts recited

---

[4] The Plaintiff's post-hearing brief suggests that the court should hold the requirement that prisoners attempt to informally resolve their problems should not be applied to this case because that "policy appears to be designed to bring to light and quickly resolve undisclosed issues. However, it is undisputed that the incident of November 25 was already widely known." [Doc. No. 86 at 4]. But the IDOC policy requires informal resolution in all cases, and the Plaintiff cites no authority that would justify the court in ignoring this portion of the IDOC grievance system.

above conclusively establish that Smith's grievances filed April 7, 2006, were not rejected as untimely; instead they were filed and returned to Smith to cure other deficiencies within five days. The reason for rejecting Smith's April 7 grievance is critical to the Court's analysis. In rejecting these grievances for reasons other than untimeliness the defendants waived the issue of untimeliness, and cannot raise it now.

Smith testified that he received the return of grievance forms for these grievances, which "told me to provide more information, additional information, which I did." [Doc. No. 84 at 18]. He stated that he provided the additional information "[p]robably immediately. And I gave this information to Counselor Cattron." [Doc. No. 84 at 18]. Smith testified that he waited about two weeks, and when he didn't get a response, he wrote to Ms. Cambe, who "said she never received it, so I refiled my grievances." [Doc No. 84 at 18]. According to Smith, the grievances he refiled on May 6, 2006, "were denied as being untimely." [Doc. No. 84 at 18].

The History of Grievances for Offender [exhibit 4] provides that on May 6, 2006, two grievances, filed by Smith, #13559 and 13562 were logged into the grievance system. The documents pertaining to these grievances were not submitted during the *Pavey* hearing. But in her affidavit in support of the defendants' motion for summary judgment, Ms. Cambe stated that the grievances Smith filed on May 25, 2006, were denied because they were filed six months after the event they described, far outside the time limit set by IDOC rules. [Doc. No. 22-2 at 3,4]. Accordingly, the parties agree that the grievances filed on May 6, 2006, were rejected as untimely.

Because the executive assistant's office accepted the grievances Smith filed on April 7, 2006, waiving the twenty day time limit, the court concludes that whatever happened before that date at the SMU, NSB, or IDU units did not prevent Smith from filing a grievance, and that the testimony dealing with events at these units or any attempt Smith may have made to file a grievance before April 7, 2006, is immaterial. The Court also concludes that because Smith had already filed grievances concerning the incident with Hunter that were accepted by prison officials, they were justified in rejecting the grievances Smith filed on May 25, 2006 as untimely.

Accordingly, the only material issues of fact remaining before the Court deal with whether Smith attempted to cure the deficiencies related to the grievances he filed on April 7, 2006. If Smith did not do so, he may be said to have forfeited his grievance procedure rights; if he attempted to do so but was intentionally or unintentionally thwarted by prison officials' actions, then their actions may be said to have rendered the grievance process unavailable to him.

Smith testified both on direct and cross examination that he did attempt to cure the deficiencies identified by Ms. Smales by giving materials to Counselor Cattron to take to the executive assistant's office. The defendants did not produce any testimony directly rebutting Smith's claim. In their post-trial brief, they point out that Smith admits that he did not make a copy of the response he sent to Ms. Smales, but the Court does not see this as in any way dispositive on the question of whether Smith attempted to cure the deficiencies noted in the April 7 return of grievance forms. Smith was on a lockup unit

without direct access to a copier, and testified creditably that he didn't keep copies of anything he sent to the executive assistant's office. He stated that he was later able to obtain copies of the grievances that had been logged into the system, but could not obtain copies of his responses to the return of grievance forms because he was told the executive assistant's office never received those documents. That Smith did not keep a copy of the material he says he sent to the executive assistant's office in response to the return of grievance forms does not establish that he did not attempt to cure deficiencies any more than Smith producing a copy of materials he says he sent to the office would prove conclusively that he did send those materials to the grievance office.

The defendants assert that "Smith also later made an inconsistent statement when he testified that he may not have responded to Ms. Smales' return form requesting additional information and may have instead filed other grievances" [Doc. No. 85 at 5], though they do not point to a specific page in the transcript where he made such an admission. They suggest the Court should draw the inference that Smith did not respond to the request for additional information but instead filed two new grievances more than a month later. (*Id.*). This Court has reviewed the transcript of Smith's testimony and can not find any support for the Defendants' assertion.

The portion of the direct examination of Smith dealing with whether he attempted to cure deficiencies reads as follows:

> Q. Okay. And the responses. I assume [they] denied your grievance?
> A. No, they didn't They told me to provide more information, additional information, which I did.
> Q. Okay. So you proved the more information. How soon after your received those [grievances] back did you provide the additional

> information?
> A. Probably immediately. And I gave this information to Counselor Cattron.
> Q. Okay. And what happened after that?
> A. I waited, maybe two weeks, and I didn't get a response. So I wrote the grievance specialist, Ms. Cambe. She said she never received it, so I refiled my grievances. She gave me different cause numbers.
> Q Okay.
> A. 13359 and 13361, I believe.
> Q And what happened to tose two grievances?
> A. They were denied as being untimely,

Doc. No. 84 at 18.

During the defendants' cross-examination of Smith, the following exchange occurred dealing with whether Smith attempted to cure the deficiencies noted in the April 7 return of grievance forms.

> Q. Those grievances were both returned to you on April 7th, 2006, is that correct?
> A. I don't have the records, so I wouldn't know. But excuse me for a second. I believe I got it right here. Yes, they were.
> Q. Okay. To clarify, you filed these two grievances on April 3rd, 2006?
> A. Yes.
> Q. And they were promptly returned to you April 7th, 2006?
> A. Yes.
> Q. And those returns required you to provide additional information, correct?
> A. Yes, it did.
> Q. And you did not respond to those returns, correct?
> A. Gave the information to Counselor Cattron. Gave him the grievances and all my information of my responses, the information she requested. And that was the last I seen of that material.

Doc. No. 84 at 24-25.

There were no questions on re-direct examination dealing with the grievances that were returned on April 7, 2006. Neither does the re-cross examination mention the grievances returned to Smith on April 7, 2006,

13

though there is a confusing exchange on re-cross that appears to form the basis for the defendants' argument that Smith wavered on his claim that he attempted to cure the deficiencies noted on the April 7, 2006 return of grievance forms:

> Q. Mr. Smith, you said that you had no trouble getting grievances in - - grievance forms in December of 2005.
> A. Well, while I was on - - in IDU.
> Q. Right. And you said that you filed it - - you filed one, but it was rejected; is that right?
> A. Well, when you say file, no, I didn't say that. I said that I sent them in. They were returned to me for various reasons, need signatures, need initials.
> Q. And did you respond?
>     * * * [Discussion between the court and defendants' counsel] * * *
> Q. When those were returned to you, did you resubmit them to comply with the additional information?
> A. I believe I did. Maybe not the exact same one. I did continue to file grievances.

Doc. No. 84 at 33-34.

This line of questioning deals not with the grievances dated April 3, 2007, which everyone agrees were "filed." Rather, Smith's answers to these questions deal with the grievances he testified that he submitted earlier but which he said were not filed and instead were returned to him for lack of signatures or initials.

Smith specifically testified on direct and cross examination that he attempted to cure the deficiencies on his April 3, 2006, grievances identified by Ms. Smales. The confusing line of questions and answers on re-cross examination does not undermine Smith's claim that he responded to the April 7, 2006, return of grievance forms, and does not support the inference that the

defendants suggest: that Smith testified inconsistently about how he responded to the return of grievance forms he was sent on April 7, 2006.

This Court was impressed with the testimony of the grievance officials who testified at the hearing and credits all of their testimony, including their testimony that they would have logged any response they received from Smith to the return of grievance forms into the computer. But the grievance officials could only testify about submissions they received; they cannot provide information about whether Smith gave responses to the return of grievance forms to a counselor that were not delivered to their office. The defendants provided no testimony directly contradicting Smith's testimony that he attempted to cure the deficiencies on the return of grievance forms he was sent on April 7, 2006, by giving material to the unit counselor.

Smith was aware that he needed to grieve these incidents if he later wished to litigate them, and the Court finds his testimony sufficiently credible to conclude that he did attempt to cure the deficiencies noted on the April 7, 2006, return of grievance forms by giving material to the unit counselor to deliver to the executive assistant's office. This is not a circumstance where the Court is required to chose between the credibility of Smith and Ms. Smales. The Court finds them both to be credible witnesses. The missing link is Counselor Cattron. Without the counselor's testimony, Smith's testimony on this point is unrebutted.

II.   CONCLUSIONS OF LAW

Pursuant to the Prison Litigation Reform Act, prisoners are prohibited

from bringing an action in federal court with respect to prison conditions until "such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). "[U]nless the prisoner completes the administrative process by following the rules the state has established for that process, exhaustion has not occurred." *Id.* at 1023.

Nevertheless, inmates are only required to exhaust administrative remedies that are "available." *Woodford v. Ngo*, 548 U.S. 81, 102 (2006); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). The "availability" of a remedy is not a matter of what appears on paper, but rather whether the process was in actuality available for the prisoner to pursue. *Kaba*, 458 F.3d at 684. When prison officials prevent inmates from using the administrative process, such as by failing to provide him the necessary forms, administrative remedies are not considered to be available. *Id.* In essence, "[p]rison officials may not take unfair advantage of the exhaustion requirement . . . and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). In determining whether an administrative remedy was available, the bottom line is whether the inmate did "all that was reasonable to exhaust" under the circumstances. *Id.* at 812.

The failure to exhaust is an affirmative defense on which the defendants bear the burden of proof. *Dole* at 809. Here, the defendants established that there were administrative remedies available to Smith, that he filed grievances

on April 7, 2006, and that those grievances were returned to him, along with a return of grievance form telling him to cure two deficiencies. After logging Smith's grievances into the system, Ms. Smales testified that she "returned [them] to him because he did not try to attempt the informal resolution and also because he had asked for monetary compensation." (Doc. No. 84 at 60).

Had the grievances been returned only because Smith asked for monetary compensation, that would have been improper. Prison officials have considerable leeway in constructing grievance systems.

> The only constraint is that no prison system may establish a requirement inconsistent with the federal policy underlying § 1983 and § 1997e(a). *See Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978). Thus, for example, no administrative system may demand that the prisoner specify each remedy later sought in litigation-for *Booth v. Churner*, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), holds that § 1997e(a) requires each prisoner to exhaust a process and not a remedy.

*Strong v. David*, 297 F.3d 649-650 (7th Cir. 2002)

The United States Court of Appeals for the Seventh Circuit has held that "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. We stated that a grievant need not lay out the facts, articulate legal theories, *or demand particular relief.* All the grievance need do is object intelligibly to some asserted shortcoming." *Nelson v. Miller*, 570 F.3d 868, 876 n.4 (7th Cir. 2009) (citations and internal quotation marks omitted) (emphasis added). The Court concludes that Smith's grievances filed on April 7, 2006, met the purposes of the exhaustion requirement because they presented a problem Smith believed he was having and provided the information

necessary to investigate his problem. That Smith may have mentioned damages as relief he would like to obtain does not justify rejection of his grievances.

But if a grievance policy requires an attempt to informally resolve a problem before filing a formal grievance, and the grievant's submissions do not show that he attempted to informally resolve the problem, as was the case here, then returning the grievance to the inmate to correct this deficiency is proper. Accordingly, because the grievances Smith filed on April 7, 2006, were returned to him with instructions to show how he attempted to informally resolve his problems, the burden shifts to him to show that he complied by responding to the return of grievance form.

Smith testified that he did respond to the return of grievance form by giving material correcting the deficiency to Counselor Cattron to deliver to the executive assistant's office, and the Court has credited this testimony. The Defendants assert that this material was never received by the grievance office, and the Court has also credited that assertion. Smith argues that the showing that he attempted to resolve this deficiency but that his grievance was not processed and investigated establishes that the grievance process was rendered unavailable to him because he did "all that was reasonable" to exhaust but was prevented from doing so by prison staff. *Dole*, 438 F.3d at 812.

This Court concludes that Smith's failure to exhaust his administrative remedies by responding to the return of grievance forms was not due to his own failings. Rather the failure of Counselor Cattron to deliver the material given to him by Smith, even if it was inadvertent and unintentional, prevented

Smith from curing his deficiencies and having his grievance investigated. *Dole v. Chandler*, 438 F.3d at 804 (Court held that "prisoner exhausted his administrative remedies even though grievance was lost and not received by board"). Because Smith did all that was "reasonable to exhaust" under the circumstances before bringing this lawsuit, the case is not subject to dismissal.

III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the defendants' request that this case be dismissed pursuant to 42 U.S.C. § 1997e(a) be **DENIED**.

**NOTICE IS HEREBY GIVEN** that within 14 days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b). Failure to file objections within the specified time waives the right to appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Lerro v. Quaker Oats Co.*, 84 F.3d 239 (7th Cir. 1996).

SO ORDERED

Dated this 18th Day of February, 2011.

S/Christopher A. Nuechterlein<br>
Christopher A. Nuechterlein<br>
United States Magistrate Judge