UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROY AUSTIN SMITH, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) CAUSE NO. 3:07-CV-0207 PS |
| DAWN BUSS *et al.*, | ) ) ) |
| Defendants. | ) ) |

OPINION AND ORDER

Correctional Officer Larry Pietrowski charged Roy Smith with obtaining a urine sample from a fellow inmate and trying to pass it off as his own prior to a drug test. A second Correctional Officer, Steven Peek, also wrote a conduct report concerning the incident against the other inmate, Thomas Price, for supplying Smith the urine. Smith alleges in this action brought under § 1983 that the conduct report against Price stated that Smith admitted getting the urine sample from Price, thus labeling him as a "snitch" and that this led to him being attacked by another inmate some 16 months later.

I screened Smith's complaint pursuant to 28 U.S.C. § 1915A, granted him leave to proceed against Defendants Peitrowski and Peek for damages in their personal capacities on his Eighth Amendment claim that they were deliberately indifferent to his safety, and dismissed all other claims [DE 5 at 5]. I also allowed a claim against the Superintendent, Dawn Buss, to proceed. [*Id*]. The parties have now filed cross-motions for summary judgment [DE 133; DE 146].

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, I must "construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

Here's what the summary judgment record reveals: Smith is an inmate at the Indiana State Prison, and on July 4, 2004, he was scheduled to take a urine test. Just prior to the test, Officer Peek saw Price give Smith a cup of urine [DE 149-3 at 3]. A different officer – Officer Pietrowski – wrote the conduct report charging Smith with failing to provide an unadulterated urine specimen. [*Id*]. In the report, Pietrowski reported what Officer Peek claims to have seen [*Id*]. In addition, according to Officer Pietrowski, Smith admitted to receiving the urine from Price [*Id.*]. Officer Peek also wrote a conduct report – this one against Offender Price. It charged Price with aiding Smith in his attempt to avoid the drug test. [DE 149-2 at 4]. Although Price's conduct report did not say anything about Smith admitting getting the urine from Price, Peek did write an inter-department communication stating that he witnessed Smith receive a urine sample from Price and also stating that Smith admitted to receiving the urine from Price [DE 149-2 at 3]. On July 13, 2004, a disciplinary hearing board found Smith guilty of the urine swap charge [DE 135-3 at 8].

In one of his affidavits, Smith states that Price let him "read a copy of the conduct report that was authored by Correctional Officer Pietrowski" in which Smith admitted receiving a

2

bottle of urine from Price [DE 135-1 at 2]. Smith also avers in another affidavit that "Offender Thomas Price . . . let me read a copy of a witness statement authored by Correctional Officer Peek" that reported that Smith had given Peek and Pietrowski information that Price had given him a cup of urine [DE 135-3 at 5].

Throughout his briefing, Smith appears to be focused on who wrote which conduct report. For example, in his sur-reply, "Plaintiff contends that Defendant Peek's [request for admissions] response No. 1 is clear, convincing, and undisputable [sic] evidence that Defendant Peitrowski did in fact author and issue a conduct report to Offender Thomas Price" [DE 166 at 4]. Smith refers to Peek's Response to Request for Admissions, which asked Peek to admit that he authored "a witness statement supporting a conduct report authored by . . . Pietrowski (Case File 07-04-0047), that stated . . . he (Smith) told you that Thomas Price gave him (Smith) the cup of urine on July 4, 2007" [DE 128 at 2]. Peek denied the request to admit, apparently on the basis that the date was wrong (he wrote the witness statement on July 4, 2004, not in 2007), but Peek did offer that "on July 4, 2004 I authored a witness statement supporting a conduct report authored by . . . Pietrowski (Case File 07-04-0047) that stated . . he (Smith) told you that Thomas Price gave him (Smith) the cup of urine" [DE 128 at 2].[1] Smith appears to be arguing that Peek's answer to the request to admit somehow establishes that Pietrowski – not Peek – wrote a conduct report on Price, and that appended to it was a Peek-authored witness statement claiming that Smith had implicated Price [DE 166 at 4].

In any event, the Defendants submitted the conduct reports prepared against Smith and Price, and these documents establish that Officer Pietrowski prepared the conduct report against

---

[1] The confusion here seems to stem from the fact that the case file number in the response to the request to admit is given as "07-04-0047." There is no such case file that is part of this case, but the case number assigned to Offender Price's conduct report is "04-07-0047" [DE 149-2 at 4], and the case number assigned to Offender Smith's conduct report is "04-07-0048" [DE 149-3 at 3].

3

Smith [DE149-3 at 3], and Officer Peek wrote the conduct report against Price [DE 149-2 at 4]. Again, Officer Peek did author an inter-departmental communication in which he stated that he witnessed Smith receive a urine sample from Price [DE 149-2 at 3], which is presumably the witness statement to which Smith refers.

In his complaint, Smith alleges that after July 4, 2004, he had problems with other inmates because they believed he had admitted receiving a bottle of urine from Price. But he does not assert in his complaint, his affidavits, his responses to interrogatories, or his deposition answers that he notified the Defendants or other ISP officials of these problems before November 25, 2005, or that he asked to be placed in protective custody or to be transferred to another facility.

Fast forward 16 months to November 2005. Smith and an offender named Trinity Hunter were both housed in an Administrative Segregation Unit. On November 25, 2005, Officer Jimmy Mask inadvertently failed to lock Hunter's cell [DE 135-4, at 10]. While Hunter's cell was unlocked, Officer Mask let several inmates, including Smith, out of their cells for recreation. "Officer Mask then observed offender Smith pull open offender Hunter['s] . . . cell door 401 and enter the cell" [DE 135-4 at 2, 4]. Mask then called for assistance when "he observed that an apparent fight was occurring in the cell between Hunter and Smith." [DE 135-4 at 2.] In his deposition, Smith stated that Hunter attempted to come out of his cell to attack him, but he also conceded that he entered Hunter's cell and stabbed Hunter multiple times with a knife [DE 149-6 at 6]. As a result of the wounds inflicted on him by Smith, Hunter was "bleeding severely from his chest, shoulder, and neck area" [DE 135-4 at 2]. Because of the serious injuries he received from this incident, Hunter was taken to St. Anthony's Hospital for treatment [DE 135-4 at 3]. As a result of his failure to properly lock Hunter's cell and allowing him to be injured by Smith,

4

Officer Mask was terminated from his position at ISP effective February 10, 2006 [DE 135-4 at 12].

Smith now asserts that he was injured in the altercation with Hunter. But the officers who interviewed Smith right after the incident did not believe he had injuries serious enough to be looked at by a doctor, and Smith admits in his deposition that he did not request medical attention after the altercation [DE 149-6 at 5].

When he was interviewed by the prison investigator after he stabbed Hunter, Smith stated he had "no problems on the unit or range in approximately eight months. He stated the last problem he had was when some offenders thought he was a snitch over a conduct report" [DE 135-4 at 3]. The investigator asked Smith "if he had had any problems with Hunter or other offenders recently . . . He stated that he has had no problems" [DE 135-4 at 4].

After investigating the incident, prison officials concluded that "it is clear through the investigation that offender Smith was the aggressor and entered offender Hunter[']s cell. Offender Smith stabbed offender Hunter several times in the arm, back, head and once in the neck area" [DE 135-4 at 7]. As a result, Smith was charged with battery with weapon. [*Id.*]. On December 12, 2005, a disciplinary hearing board found Smith guilty of battery [DE 149-5]. That decision has not been set aside [DE 149-6 at 7].

Smith filed grievances after his altercation with Hunter, claiming the Defendants had placed him in danger by labeling him as a snitch [DE 135-3 at 1-2], and subsequently filed his complaint in this case accusing them of being responsible for Hunter attacking him. Hunter filed his own § 1983 complaint, alleging that on November 25, 2005, he "was stabed [sic] re-peatedly [sic] by another offender who . . . [ISP officials] . . . allowed to break the safety and security of the facility and enter my cell through an un-locked cell door" [*see Hunter v. Donahue, et al.*,

3:07-CV-593, DE 1 at 3]. That complaint was dismissed for failure to exhaust administrative remedies [*see id.,* DE 112].

In his motion for summary judgment, Smith asserts that the Defendants placed him at "risk of substantial harm" by "labeling and exposing Plaintiff as a prison snitch to the prison's general population" and that Officer Mask was also responsible for the altercation between Smith and Hunter because he left Hunter's cell door unlocked [DE 133 at 1-2]. Recall that those two events are separated by 16 months calling into question whether they are related at all. Smith nonetheless argues that the Defendants' "deliberate indifference to [his] safety and security violated [his] Eighth Amendment . . . right to be free from cruel and unusual punishments" and also violated the Fourteenth Amendment's due process and equal protection clauses [DE 133 at 2-3].

The Defendants respond in three ways: First, that there is no evidence to suggest that they were deliberately indifferent to Smith's safety. Second, because it was Smith who attacked Hunter, not the other way around, and because Smith was found guilty of that violation, his claims are barred by the doctrine of *Heck v. Humphrey,* 512 U.S. 477 (1994). Finally, they also assert that they are entitled to qualified immunity.

Smith first claims that "Correctional Officer Jimmy Mask was deliberately indifferent to Plaintiff's safety and security" and that his actions caused Smith to be injured [DE 134 at 28-29]. The problem with this argument is that Smith did not name Officer Mask as a defendant in this action [DE 1 at 2], and § 1983 creates a cause of action for damages based on personal liability. So a plaintiff must show the defendant's personal involvement or participation, or direct responsibility for the conditions of which he complains. *Rascon v. Hardiman*, 803 F.2d 269, 273

(7th Cir. 1986); *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983); *Moore v. Ind.*, 999 F.2d 1125, 1129 (7th Cir. 1993). This is another way of saying that the doctrine of *respondeat superior*, under which a supervisor may be held liable for a fellow employee's actions, has no application to § 1983 actions. *Wolf-Lillie*, 699 F.2d at 869. Accordingly, even if Mask was deliberately indifferent to Smith's safety, rather than merely being negligent, his deliberate indifference cannot be charged or imputed to the Defendants named in this action.

Smith also claims that the Defendants' conduct violated the Fourteenth Amendment's due process and equal protection clauses. But while Smith raised a Fourteenth Amendment claim in his complaint [DE 1 at 4], the screening order granted Smith "leave to proceed against the defendants for damages in their personal capacities on his Eighth Amendment claim that they were deliberately indifferent to his safety," and dismissed all other claims [DE 5 at 5]. Accordingly, there is no longer a Fourteenth Amendment claim pending.

As for the Eighth Amendment claim – in which the Smith argues that the defendants are responsible for his being attacked by Hunter – Smith must prove (1) that objectively, the injury is sufficiently serious to deprive the prisoner of the minimal civilized measure of life's necessities; and (2) subjectively, that the prison official's actual state of mind was one of "deliberate indifference" to the deprivation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

Prison officials "have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833, quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)(alterations in original). Deliberate indifference in such circumstances is defined as criminal recklessness. *Farmer*, 511 U.S. at 839-840. "[A] prison official may be held

7

liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

In dealing with the parties' cross-motions for summary judgment, the first question that must be addressed is whether the Defendants intentionally labeled Smith as a snitch to other inmates, as Smith alleges in his complaint. If they told other inmates that Smith had fingered Hunter in the urine swap incident, then they were arguably deliberately indifferent to Smith's safety.

Smith asserts in his motion for summary judgment that he is "entitled to judgment as a matter of law because the defendants cannot deny that their labeling and exposing plaintiff as a prison snitch to the prison's general prison population subjected plaintiff to the risk of substantial harm" [DE 133 at 1]. But they do deny it; the Defendants submitted declarations stating that they did not provide information to any inmate that Smith had admitted receiving the bottle of urine from Price [DE 149-1 at 1, DE 149-2 at 1, and DE 149-3 at 1]. Moreover, while Smith stated in his deposition that he believes the defendants "made these documents" accusing him of being a snitch "and spread them around the institution," he concedes that he has no actual knowledge that they actually handed these documents out to inmates because he "wouldn't have seen that, wouldn't have been there" [DE 149-6 at 2-3].

The Defendants asked Smith in interrogatories to provide them with the names of the "the individuals you claim helped disseminate Defendant Pietrowski's July 4, 2004 conduct report, along with the names of any witnesses who may have knowledge regarding the alleged dissemination" [DE 130 at 5]. Smith responded "1. D-Cell House inmate clerks and cell house

8

workers, 2. Plaintiff's July 13, 2004, inmate lay advocate, 3. Price's July 13, 2004, inmate lay advocate (if he had one), 4. I.S.P. inmate law library clerk's [sic] and workers, [and] 5. inmates employed at the Deputy's Office (D.O.)." [*Id.*]. In response to an interrogatory asking who Smith believed was responsible for disseminating Defendant Buss's denial of his appeal of the finding that he was guilty of the urine swap, he identified his lay advocate, Price's lay advocate, and inmates working at the ISP law library [DE 130 at 5]. None of these persons identified by Smith in his interrogatory responses are prison officials, and Smith has not provided statements from any of the inmates listed in his interrogatory response affirming that any of them received information from the Defendants suggesting that Smith was a snitch.

It may be that other officials, perhaps the disciplinary hearing officer or screening officer dealing with the disciplinary action against Price, gave Price a document stating that Smith admitted receiving the urine from Price, and that Price may have shown it to other inmates. But even assuming this occurred, a person who was not personally involved in the alleged wrongdoing cannot be held liable for damages under § 1983. *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996). Defendants Buss, Peitrowski, and Peek cannot be held responsible for the actions of other prison officials or for the actions of the inmates mentioned in Smith's interrogatory responses. *Moore,* 999 F.2d at 1129.

Smith has not provided admissible evidence from any source that any of the Defendants distributed documents that would have implicated Smith as a snitch to other inmates. And on the other side of the equation, the defendants have submitted sworn statements steadfastly denying that they did so. In the absence of any evidence to the contrary, no reasonable factfinder could

9

conclude that the Defendants intentionally labeled Smith as a snitch to other inmates, thereby putting him at risk of being attacked by other inmates.

Although the Defendants themselves did not give a document to Price or other inmates suggesting that Smith fingered Price, they might still be deliberately indifferent to his safety if they knew that inmates believed Smith was a "snitch," thus putting Smith at risk, but did nothing to protect him. So the second question that must be addressed is whether the Defendants were aware before Smith's altercation with Hunter that Smith might be in danger because other inmates may have thought that Smith informed on Price.

In order for the Defendants to be liable under this theory, Smith must establish that they were deliberately indifferent to his safety. Deliberate indifference is shown by "something approaching a total unconcern for [an inmate's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992) (internal citations omitted). A defendant must have "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Id.* at 676 (quotation and citation omitted); *see also Sellers v. Henman*, 41 F.3d 1100 (7th Cir. 1994) (mere negligence is insufficient to establish deliberate indifference). This total disregard for a prisoner's safety is the functional equivalent of a desire that the prisoner be harmed. *Duane*, 959 F.2d at 676.

The Defendants have all submitted declarations stating that they were unaware of any threat to Smith's well being before his altercation with Hunter [DE 149-1 at 1; DE 194-2 at 1; DE 194-3 at 1]. For his part, Smith has not submitted admissible evidence suggesting that any of the Defendants were aware that other inmates may have believed he was a snitch. Nor does he assert that he informed any of the Defendants that he believed he was in danger of being

attacked. For example, Smith never requested of any prison official that he be placed in protective custody nor did he ask for any other form of intervention.

In their second set of Interrogatories to Smith, the Defendants asked him to "state the full names and titles of all individuals [to] whom you gave notice of potentially dangerous situations either with other prisoners generally or with offender Trinity Hunter specifically, before the November 25, 2005 altercation" [DE 130 at 2]. Smith responded that he gave notice to Chuck Penfold, the Indiana Department of Correction's final reviewing authority, and that he filed grievances on April 3, 2006, and May 24, 2006, after the altercation with Hunter [*Id.*].

Obviously, filing a grievance after the altercation with Hunter does not put anyone on notice that Smith might have been in danger *before* the altercation occurred. But Smith does state that he notified Mr. Penfold on September 2, 2004, and to "see exhibit 20 of appendix" for the content of the notice [DE 135 at 2; DE 135-2 at 11-12]. Appendix 20 to Smith's motion for summary judgment is an appeal to the final reviewing authority. There, Smith stated that "Sgt. Pietrowski is placing my life in jeopardy by saying and writing that I snitched on Offender Price" [DE 135-2 at 12].

Mr. Penfold is the official at the Indiana Department of Correction's central office in Indianapolis who is responsible for reviewing inmates' final appeals from disciplinary actions. Nothing in the record suggests that Mr. Penfold passed the statement embedded in the middle of Smith's appeal about his life being in jeopardy to ISP officials, and accordingly the appeal could not have put the Defendants on notice that Smith might be in danger from other inmates. It is true that as acting superintendent, Defendant Buss would have been part of the disciplinary appeal process, but Smith does not allege that he put any language in his appeal to her that might

11

suggest he was in any danger from having been labeled as a snitch. Indeed, at his deposition, Smith was asked point blank if "to your knowledge did the defendants in this case have any reason to believe that Mr. Hunter was going to have an altercation with you on November 25, 2005?" His telling response: "Not to my knowledge" [DE 149-6 at 2].

In order to be deliberately indifferent, a prison official must have "actual knowledge of impending harm easily preventable" *Duane*, 959 F.2d at 676 (citation omitted). There is no admissible evidence in the record from which a reasonable factfinder could infer that the Defendants were aware of any potential threat to Smith's safety before the altercation between Smith and Hunter. So no reasonable factfinder could find that the Defendants were deliberately indifferent to Smith's safety.

The Defendants argue in the alternative that Smith's claim that Hunter attacked him is "barred under 42 U.S.C. § 1983 because the prison disciplinary board's finding that Plaintiff committed battery has not been overturned" [DE 147 at 8]. Under *Heck* to recover damages for any "actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87 (1994)(internal citations omitted). The *Heck* doctrine applies to prison disciplinary proceedings as well as criminal proceedings. *See Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (concluding that a claim arising from a prison disciplinary hearing seeking "declaratory relief and money damages . . .that necessarily impl[ies] the invalidity of the punishment imposed, is not cognizable under § 1983").

In his memorandum in support of his motion for summary judgment, Smith acknowledges that the *Heck* doctrine applies to prison disciplinary hearings, but suggests that "courts have recognized that an inmate may file a § 1983 [action] to challenge prison disciplinary guilty findings when the remedy of habeas corpus is not available" [DE 134 at 34]. Smith argues that he falls within this exception to *Heck* because at his prison discipline hearing, he did not have evidence of Mask's termination, nor a video recording of the attack and the events leading up to it, which he obtained through discovery in this case [DE 157 at 7-10]. He argues that if he had had this evidence at his disposal, he would have filed a habeas petition, but since he did not, he should be permitted to circumvent *Heck* [*Id.*]. But this is the type of claim that must be raised in a § 2254 action – not a § 1983 claim. And the narrow exception to *Heck* that Smith references is inapplicable here: it concerns the ability of former prisoners, no longer in custody, to challenge the constitutionality of a conviction or confinement through § 1983, after habeas relief is no longer available to them. *See Spencer v. Kemna*, 523 U.S. 1, 20-21 (1998) (concurring and dissenting opinions); *Carr v. O'Leary*, 167 F.3d 1124, 1127 (7th Cir. 1999).

In his complaint in this case [DE 1], Smith did not challenge the disciplinary hearing board's finding that he was guilty of battery against Hunter. To award damages to Smith because he was the victim of an attack by Hunter would require a finding that Hunter attacked Smith. But as noted, the prison disciplinary board found the opposite: that Smith attacked Hunter. "*Heck* forbids a prisoner in his civil rights case to challenge a finding in his criminal or prison-discipline case that was essential to the decision in that case; if he insists on doing that, the civil rights case must be dismissed." *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011).

Because the relief that Smith requests would render the board's finding of guilt invalid, Smith cannot obtain relief on a claim that he was attacked by Hunter so long as the prison disciplinary finding that Smith attacked Hunter stands. In *Moore,* a prison disciplinary board found the plaintiff guilty of assault, and he sought to challenge that finding in his § 1983 action accusing guards of excessive use of force. The Seventh Circuit held that while the plaintiff's claim that he "was the victim of an utterly unprovoked assault" was conceivably true, it was barred by *Heck* as long as the disciplinary hearing board's finding of guilt remained in effect. *Id.* at 725.

The Defendants also assert in their memorandum in support of their motion for summary judgment that they are entitled to qualified immunity [DE 147 at 14]. But because I have determined that the Defendants are entitled to summary judgment on the merits, I will not address their claim that they are entitled to qualified immunity.

For the foregoing reasons, the court **DENIES** the Plaintiff's motion for summary judgment [DE 133], **GRANTS** the Defendants' motion for summary judgment [DE 146], and **DIRECTS** the clerk to enter judgment in favor of the Defendants and against the Plaintiff.

**SO ORDERED.**

ENTERED: August 23, 2012

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT